ARBIB & HOULBERG, Inc., v. SECOND RUSSIAN INS. CO.

(Circuit Court of Appeals, Second Circuit. December 3, 1923.)

No. 36.

I. Insurance ⟞665(4)—Evidence held to show loss by leakage of sea water into vessel.

Evidence in action on policy insuring against perils of the sea *held* to show that damage to goatskins was caused by leakage of sea water into the vessel.

⟞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**2. Insurance ☞403—Damage caused by leakage of sea water held loss by "perils of the seas."**

Damage to insured cargo, caused by leakage of sea water into the vessel during a storm, *held* a loss by "perils of the seas," within a policy insuring against such loss.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Perils of the Sea.]

**3. Insurance ☞403—Definition of "perils of the seas."**

When used in insurance policies, "perils of the seas" embraces all kinds of marine casualties, and every species of damages suffered by the ship or ship's cargo at sea, due to the extraordinary action of the wind or the waves.

Appeal from the District Court of the United States for the Southern District of New York.

Libel by Arbib & Houlberg, Inc., against the Second Russian Insurance Company. Decree for respondent, and libelant appeals. Reversed, with directions to render a decree in favor of libelant.

Duncan & Mount, of New York City (Russell T. Mount, of New York City, of counsel), for appellant.

Kneeland, Harison & Hewitt, of New York City (William Harison, of New York City, of counsel), for appellee.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

ROGERS, Circuit Judge. The respondent is an insurance company organized and existing under the laws of Russia, and it is engaged in writing marine insurance in the city of New York, and on December 7, 1918, it made and delivered through its duly authorized agent at New York a policy of insurance upon a cargo of goatskins valued at $100,000 shipped on the steamship Shinkai Maru and rail at and from port and/or ports in India to New York, direct or otherwise, including transshipment if required. By the terms of the policy the respondent insured the libelant against all loss or damage to the goatskins caused by the adventures and perils of the seas, fires, enemies, barratry of masters and mariners, and all other perils, losses, and misfortunes that have or shall come to the hurt, detriment, or damage of the said goods and merchandise or any thereof.

The steamship sailed on September 25, 1919, from Madras, India, on a voyage to Kobe, Japan, and prior to her departure from Madras there was loaded on the steamship Shinkai Maru 220 bales of goatskins the property of the libelant which property was subject to the policy of insurance above mentioned. At Kobe, Japan, the skins were transshipped and loaded on the steamship Nagato Maru, and by that vessel they were carried to Vancouver, B. C., from which place 140 of the said bales were shipped by rail to Boston, Mass., and the remaining 80 bales were shipped by rail to Philadelphia, Pa. It is alleged that while proceeding upon the voyage from Madras to Vancouver 135 bales of the goatskins suffered severe damage caused by the perils of the sea and risk insured against, the total amount of the damage being $17,758.07, and that the proportion of the loss for which

the respondent was liable, under its policy, was $3,196.45, with interest thereon from January 1, 1919.

The District Court has found as a fact that most of the damage was caused by salt water. The District Judge dismissed the libel and in his opinion said:

"In view of this record, I think that most of the damage shown was caused by salt water. It remains, however, to determine whether this salt water arose from perils of the sea. There is some reason to believe that it did, owing to the testimony of the master that he passed through a storm. But the wave which injured the door to the wireless house could not have been the cause of this damage, because the cargo was not wet on top, and the hatches seem to have been tight. I think it too speculative to make a finding here that salt water which caused the damage to the hides was introduced owing to the violence of the storm. Upon the existing record, I think enough has not been shown to relieve a carrier from liability (The Rosalia [C. C. A.] 264 Fed. 285) and if a carrier would be liable it would be because of lack of proof that the injury was due to perils of the sea. Consequently a foundation has not been laid for holding the respondent insurance company liable. The burden is upon the libelant to establish that the loss was due to insured perils, as it would be upon the ship in a case between the cargo owner and the ship to show a loss due to excepted perils. The libelant has not, in my opinion, sustained this burden. Accordingly the libel is dismissed, with costs."

The libelant has appealed from the decree dismissing the libel. The sole questions raised by the appeal are two:

"(1) Has the libelant proved that the damage was caused by sea water?
"(2) If that fact has been established, then we must determine whether the damage was due to 'perils of the seas.'"

The respondent denies that the damage was caused by sea water, and, if it was so caused, it denies that it was occasioned by "sea perils." We shall consider these questions in their order.

[1] We agree with the court below that the damage was caused by sea water. That fact is established by the evidence. The testimony of the captain of the ship explains the matter. The following is an excerpt from his testimony:

"Q. What sort of voyage did you have from Kobe to Vancouver? A. We experienced heavy sea.
"Q. Was it unusually heavy? A. (looking at protest). Not usual storm; more than usual.
"Q. In what respect was it unusual? A. Smash the door of the wireless room on top of the deck house.
"Q. How was the wind? A. Gale of wind.
"Heavy? A. Heavy.
"Q. The seas, how were they? A. Seas rough.
"Q. How rough—the usual roughness you encounter in a voyage? A. Caused her to pitch and roll very heavily.
"Q. You took every precaution to prevent any damage occurring to the ship or the cargo during this storm? A. Yes; we took all precautions.
"Q. How about the hatches? A. Battered down, and rope tied across (indicating criss-cross).
"Q. Was there anything else you could do to prevent damage to ship or cargo that was not done? A. We did all we could do.
"Q. In spite of what you could do, the ship suffered some damage? A. Yes.
"Q. Did any water get in the hatches or in the holds? A. No; I don't think so.

"Q. When did this storm occur that you have just been describing—what dates? A. I don't think the water got inside the hatches, because I took all precautions.

"Q. (repeated). When did this storm occur that you have just been describing—what dates? A. From October 24 to 25, and from November 1 and 3."

He testified that the storm was so severe that it broke in the door of the wireless room, which was situated on top of the deckhouse, amidship. His testimony continued as follows:

"Q. What caused the damage to the door of the wireless room? A. The water coming on it.

"Q. Water washing over the deck? A. Yes.

"Q. Is the wireless room door above the deck? A. Above the deck.

"Q. How high up above the deck? A. From the main deck, you mean?

"Q. Yes. A. About 14 or 15 feet.

"Q. And the hatches are on the main deck? A. Yes.

"Q. So the water washing over to smash the door of the wireless room was washing over these hatches in which the cargo was stowed—is that right? A. Yes; I think so.

"Q. Water might have got in? A. I think so.

"Q. Did you go into the hatches after the storm occurred, before the cargo was taken out? A. No.

"Q. So it might have been damaged by water without your knowing it? A. I can't say anything about that.

"Q. So, when you state that no water got down in the holds, you are making a statement about which you really don't know whether any did or not—is that true? A. Yes; it might be a little let in."

That the goatskins were damaged by *salt* water is made clear by the testimony of the experts. A Boston marine surveyor and inspector, who had been engaged in the business since January, 1877, who began as an office boy in a marine insurance office in 1865, and whose qualifications as an expert were admitted at the trial by counsel for the respondent, testified that the skins "had been in actual contact with sea water." A further excerpt from his testimony is as follows:

"Q. Well, did you consider from your examination that some of these bales must have stood at any time in sea water? A. Why, yes; all of the 55 had come in contact with it. I won't say stood in sea water, but I can't see any other way they could come in contact with it.

"Q. Well, if they were in the hold of the ship, and they were on the bottom —. A. (interposing). Then they would stand in it.

"Q. Yes. Now, did you make any chemical test, or any kind of a chemical examination? A. I did not. That was useless, within my limited chemical knowledge, for they were salted skins, and my only test for the action of sea water is to get the sea water reaction, which is almost exactly the same as salt water.

"Mr. Kneeland: Or the nitrate of silver test?

"The Witness: Yes.

"Q. In other words, you concluded that, inasmuch as the skins were salt skins, the chemical test would not be of much value in determining the cause of this damage? A. That is so. I relied only upon my knowledge of the character of damage.

"Q. You made no report of it, if you observed any damage caused by fresh water? A. No; I did not mention it.

"Q. And your best recollection is that you did not notice any fresh water damage? A. If I did, I have forgotten it.

"Q. Is there any doubt whatever in your mind as an expert, after examining these bales, that the damage was caused by sea water? A. None whatever."

The ship which carried this consignment of skins was a comparatively new vessel, which makes the following excerpts from the testimony of this surveyor instructive:

"Q. Mr. Palmer, even the best vessels leak a little at times, do they not? A. The newer they are the more they leak for a while.

"Q. How does that water get in? A. In a new vessel?

"Q. Yes. A. In a new vessel it comes through the seams. They are flush seams, and the caulking is done by a blunt caulking iron, which jams right straight along, and jams the integrity of the plates. Now, in the working or strain of the vessel, that caulking, which is just simply a blunt end, separates and weeps a little bit—enough to allow a drop or two of water to come in before it commences to rust out. When these seams do rust out, they remain so permanently. So that a brand new vessel is more likely to take in more water from the strain in rough weather than a vessel that is three or four or five or six years older—up to the time that her structural weakness develops.

"Q. And in the case of a storm, of course, she would be likely to take in more water than in calm weather? A. Yes; but I cannot very well apply that here, because I do not know anything about her age. I am only theorizing.

"Q. But even older vessels leak to some extent, particularly in stormy weather, do they not? A. Yes. A vessel is really weaker than an eggshell; so when a vessel rides two seas, as I have very frequently seen them, of course there is a tremendous strain that comes on these thousands and even millions of rivet holes, and they are subject to that strain—and even there the water will leak through the rivet holes, as well as in the caulking—but a rivet hole leak is not so pronounced, because it had to go through such a number of thicknesses.

"Q. So that no matter how well the hatches may be covered, there is always a possibility that some sea water will get into the hold of the vessel? A. Yes; there is very little leaking through hatches. They are taken care of on every voyage. After the hatch is put on, it is thoroughly caulked with oakum, and two or three tarpaulins are put over, so that leaks from hatches are very few, unless the seas are heavy enough to wash off the tarpaulins, and then the vessel is full; but, if her decks are full of water all the time, it gradually lightens up the oakum. And then they get water sometimes to the extent of bursting the hatches off, and then the water goes down in the hold."

Again he testified:

"Q. All that you reported was sea water damage? A. Sea water damage, the result of the contact of these bales with sea water. If I may qualify that, I do not mean to have you infer that every skin that I saw in every one of those bales was in actual contact with sea water; but the bales had been in contact with sea water, and so long a time that decomposition had set in, which would continue from one skin to another, so it was simply decomposition that was continuing in that bale that had been in actual contact with sea water.

"Q. This examination was made by you for neither side in this case? A. I always intend to have every report that I ever make from an absolutely disinterested standpoint.

"Q. I mean, you did not represent either the underwriter or the shipper? A. No; if I am called upon to represent people, I decline."

The deposition of the port warden at Vancouver was introduced in evidence. It appears that under the law of British Columbia he had cognizance of all matters relating to the survey of vessels and cargo arriving in the port of Vancouver in damaged condition. He examined the goatskins herein involved after their arrival at Vancouver. He testified that they were in a damaged condition, and that the damage was in his opinion due to sea water. There is similar testimony from other witnesses in the record.

[2] Having reached the conclusion that the damage to the cargo was caused by the entrance of sea water into the vessel by leaking, it remains for us to determine whether the damage which resulted was caused by a peril of the sea as between the assured and the insurer. It is conceded that a distinction exists between the legal effect on a common carrier and the legal effect on an insurer in the case of a loss arising from a peril of the sea. The distinction is clearly set forth in Liverpool Steam Co. v. Phœnix Ins. Co., 129 U. S. 397, 9 Sup. Ct. 469, 32 L. Ed. 788. See, also, The Jeanie, 236 Fed. 463, 149 C. C. A. 515; The Turrett Crown (D. C.) 282 Fed. 354; The Ft. Morgan (C. C. A.) 284 Fed. 1.

In the case of The Folmina, 212 U. S. 354, 29 Sup. Ct. 363, 53 L. Ed. 546, 15 Ann. Cas. 748, the owner of cargo sued the carrying vessel for damage to cargo which was caused by the "unexplained presence of sea water in the vessel." In that case the Supreme Court found that the damage was caused by sea water, and that it was not shown that the vessel encountered sufficient stress of weather to warrant the inference that it came in because of the action of external causes, and it was held that the unexplained presence of sea water in a vessel is not of itself a peril of the sea, within the meaning of an exception of perils of the sea in the bill of lading. That case is distinguishable from the case now before the court in that the evidence in the instant case shows that the vessel encountered severe storms, and that an inspection of the hold showed that there had been leaking rivets.

[3] The phrase "perils of the seas" occurs in bills of lading, where it is used as a ground of the carrier's exemption from liability, and it is also employed in policies of insurance in stating the ground of the insurance company's liability. In the interpretation of the phrase when used in bills of lading, the courts have adopted great strictness, as the carrier is seeking exemption of liability; but in the interpretation of the phrase when used in insurance policies, the courts in many cases have given to it great elasticity of meaning. We think perils of the sea embrace all kinds of marine casualties, and every species of damage suffered by the ship or ship's cargo at sea, due to the extraordinary action of the wind or the waves. In Hazard v. Insurance Co., 8 Pet. 557, 8 L. Ed. 1043, the Supreme Court said:

"In an enlarged sense, all losses which occur from maritime adventures may be said to arise from perils of the sea; but the underwriters are not bound to this extent. They insure against losses from extraordinary occurrences only; such as stress of weather, winds and waves, lightning, tempest, rocks, etc. These are understood to be the 'perils of the sea' referred to in the policy, and not those ordinary perils which every vessel must encounter."

See, also, The Northwestern (S. C.) 114 S. E. 543, American Maritime Cases (1923) 1.

We think the damage done to the skins in the case now under consideration was caused by the extraordinary perils of the sea which the ship encountered.

Judge HOUGH heard the argument, and after reading the evidence submitted concurred with us in the conclusion reached. Because of his necessary absence from the court, he has not seen the opinion as written.

The decree is reversed, with directions to enter a decree in favor of libelant for $3,195.37, with interest and costs.