**ALLEN N. SPOONER & SON, INC.,**
Libelant-Appellant,

v.

**The CONNECTICUT FIRE INSURANCE
CO., Respondent-Appellee.**

No. 239, Docket 27881.

United States Court of Appeals
Second Circuit.

Argued Feb. 1, 1963.

Decided March 11, 1963.

Kenneth H. Volk, of Burlingham, Underwood, Barron, Wright & White, New York City (Hervey C. Allen, New York City, of counsel), for libelant-appellant.

Sheldon A. Vogel, of Bigham, Englar, Jones & Houston, New York City (Joseph J. Magrath, 3d, New York City, of counsel), for respondent-appellee.

Before LUMBARD, Chief Judge, and SMITH and HAYS, Circuit Judges.

HAYS, Circuit Judge.

This is an action on a policy of marine hull insurance. The district court held that the loss on which appellant sued was not within the coverage of the policy and dismissed the libel. We reverse and direct that judgment be entered for the libelant.

Appellant takes no exception to the district court's findings of fact and we accept those findings as supported by the evidence. We disagree with the district court's application of the law to the facts as found.

Libelant's claim arises out of the loss of its crane barge, called Pulling Machine No. 12, while the barge was bareboat chartered to Richard W. Stasch, doing business as R. W. Stasch & Company. Stasch chartered the barge for the purpose of raising the sunken tanker Empress Bay from the East River where it lay in about 60' of water approximately mid-channel between the Brooklyn and Manhattan bridges.

Pulling Machine No. 12 consisted of a tower, or leader frame, about 75 feet in height mounted on a wooden barge 139' long and 38' wide. At all times prior to the accident in question the barge was well found and seaworthy.

On July 24, 1958 Pulling Machine No. 12 was engaged in lifting the Empress Bay. It was operating under the direction of Stasch who took a position on the bow of the No. 12 and transmitted orders by microphone. While the vessel was so engaged one of the guy wires supporting the crane parted and the crane collapsed and was lost over the side. The hull of the barge was so severely damaged by the collapse of the crane that it was concededly a constructive total loss.

The parting of the guy wire which resulted in the collapse of the crane was caused by the tilting of the barge while the lifting operation was in progress. The tilting of the barge was caused by the swells from a large vessel which passed the No. 12 just as it was engaged in the lifting operation.[1]

The loss of the crane could have been prevented by the use of side slings with which the No. 12 was equipped and which would have controlled the "hoist load" so that the guy wire would not have been subjected to the breaking stress. Stasch was negligent in failing to use the side slings.

The district court did not make clear whether, in its view, the proximate cause of the loss of the barge was the negligence of Stasch or the swells from the passing tanker, although it characterized the latter as "a culminating factor in causing the accident". It is not necessary for us to resolve the issue because in our view the insurance company is liable on its policy in either case.

The No. 12 was covered by a marine insurance policy issued by appellee, two clauses of which are here involved.

The "Perils" clause provides:

"Touching the adventures and perils which we, the said Insurers, are contented to bear and take upon us, they are of the Harbors, Bays, Sounds, Seas and other waters as above named, and Fire, it being the intent of these Insurers to indemnify the Assured for these Insurers' proportion of General Average and/or Salvage Charges and/or loss, damage, detriment or hurt to the said vessel arising from perils aforementioned for which these Insurers may be liable under this policy; it is a condition precedent, however, to any liability under this policy, that the Assured establish that any claim, whether for general average charges, salvage expenses or loss, damage, detriment or hurt to said vessel, has been directly caused by a peril insured against as aforesaid, and that the Assured further

---

1. Appellee disputes this finding as well as the finding that the tug used by Stasch for the lifting operation did not cause or contribute to the accident. On the basis of the evidence in the record we cannot say that these findings are clearly erroneous.

establish that such general average charges, salvage expenses or loss, damage, detriment or hurt has not arisen from or been caused by, either directly or indirectly, any of the following or other excluded causes, namely: incompetency of the master or insufficiency of the crew, or want of ordinary care in loading or unloading, stowing or broaching the cargo of the vessel; rottenness, inherent defects, or other unseaworthiness; theft, barratry, or robbery. It is further mutually agreed that this policy does not cover bursting or exploding of boilers, collapsing of flues or injury, derangement or breakage of machinery and/or any expense in consequence thereof or any loss of or damage to any such parts and/or to any other parts of the vessel directly or indirectly resulting from such occurrences, unless the Assured shall establish that such occurrences were caused solely by sinking, stranding, collision with another vessel or burning. No loss is to be paid when such loss arises from failure to keep the vessel well pumped out."

The "Inchmaree" clause provides:

"This insurance also specially to cover (subject to the average and all other conditions of this policy not conflicting herewith) loss of or damage to hull or machinery through the negligence of master, mariners, engineers or pilots, or through bursting or explosion of boilers, breakage of shafts, or through any latent defect in the machinery or hull, provided such loss or damage has not resulted from want of due diligence by the owners of the ship, or any of them, or by the manager, but free from any claim for the part in which latent defect existed."

It is stipulated that libelant's provable damage under the policy is $32,020 with statutory interest from July 24, 1958.

Appellee was duly notified of the charter party and agreed to add "R. W. Stasch & Co." as a named assured for the period of the charter.

The District Court concluded that the loss of the No. 12 was not covered by either the "Perils" clause or the "Inchmaree" clause because, in its view, (1) the swells created by the passing of a large vessel were not "perils of the sea" within the "Perils" clause; and (2) because Stasch was an "owner" for purposes of the proviso in the "Inchmaree" clause barring recovery for loss resulting from want of due diligence by an owner. We hold that the District Court erred on both points.

In determining the meaning of the terms of the policy we are guided by what was said in Henjes v. Aetna Ins. Co., 132 F.2d 715, 719 (2d Cir.), cert. denied, 319 U.S. 760, 63 S.Ct. 1316, 87 L.Ed. 1711 (1943):

"It is a general rule of construction that where the language of a policy of insurance may reasonably be construed in more than one way the meaning beneficial to the insured is to be given effect by resolving fair doubts against the insurer who chose the language which created them. Ashenbrenner [Aschenbrenner] v. United States F. & G. Co., 292 U.S. 80, 54 S.Ct. 590, 78 L.Ed. 1137; DeHart v. Illinois Casualty Co., 7 Cir., 116 F.2d 685. That is particularly applicable to a time policy of marine insurance."

### I. PERILS OF THE SEA

This court interpreted and applied the "Perils" clause in New York, N. H. & H. R. R. v. Gray, 240 F.2d 460 (2d Cir.), cert. denied, 353 U.S. 966, 77 S.Ct. 1050, 1 L.Ed.2d 915 (1957). There the insured recovered for losses sustained when water leaked into a moored carfloat causing the vessel to list and settle, with a resultant loss of certain cargo. We held that:

"The loss resulted from a 'peril of the seas.' 'It is enough that damage be done by the fortuitous action of

the sea. For instance, where cargo was damaged by the incursion of seawater through a hole in a pipe gnawed by rats, the House of Lords held this to be a peril of the seas.' \* That the sea is calm makes no difference.\*\* Negligence, whether or not 'gross' but for which the accident would not have occurred, will not serve as a defense to such a policy.

---

\*\* 2 Arnold, Marine Insurance (14th ed.) Section 812.

\*\*\* Judge Rifkind in Compania T. Centro-Americana v. Alliance Ass. Co., D.C., 50 F.Supp. 986, 991; Olympia Canning Co. v. Union Marine Ins. Co., 9 Cir., 10 F.2d 72."

240 F.2d at 464.[2] The Gray case governs the present case. See also Cary v. Home Ins. Co., 235 N.Y. 296, 300, 139 N.E. 274 (1923); Petrie v. Phenix Ins. Co., 132 N.Y. 137, 144, 30 N.E. 380 (1892); James A. McAllister & Co. v. Western Assurance Co., 218 App.Div. 564, 218 N.Y. S. 658 (1st Dept. 1926); Borgemeister v. Union Ins. Soc'y, 127 Misc. 9, 214 N.Y.S. 548 (City Ct. 1926).

The swells which caused the derrick on the No. 12 to buckle were a "fortuitous action of the sea," and therefore within the scope of the "Perils" clause.

Appellee cites us to Continental Ins. Co. v. Patton Tully Transp. Co., 212 F.2d 543 (5th Cir., 1954) and Western Assur. Co. v. Shaw, 11 F.2d 495 (3d Cir.), cert. denied, 273 U.S. 698, 47 S.Ct. 93, 71

L.Ed. 846 (1926), which contained language to the effect that ordinary swells are not perils of seas or harbors within the meaning of marine insurance policies. The passages relied on by appellee contain alternate holdings at best, since in both cases, the foundered vessels were unseaworthy. Moreover, both decisions rest on findings that swells and waves were not extraordinary under the circumstances. Both rest on the rule that "[T]here must be some casualty, something which could not be foreseen as one of the necessary incidents of the adventure. The purpose of the policy is to secure an indemnity against accidents which may happen, not against events which must happen." The Xantho, 12 App.Cas. 503, 509 (1887).

Whether the loss resulted from a "necessary incident" of the venture—i. e. from ordinary wear and tear—or from an accident which could not be foreseen depends, of course, on the nature of the vessel and operation involved. Compania de Navegacion Interior, S. A. v. Fireman's Fund Ins. Co., 277 U.S. 66, 80, 48 S.Ct. 459, 72 L.Ed. 787 (1928); Klein v. Globe & Rutgers Fire Ins. Co., 2 F.2d 137 (3d Cir., 1924). In the present case, Stasch was engaged in an extremely delicate operation. Without the use of side slings, the No. 12 could tilt only three degrees without danger to the derrick. Shipping above and below the site of operations was held up, so as to prevent swells. Under these circumstances, the swells caused by the

---

2. Appellee attempts to distinguish the Olympia Canning Co. and Compania T. Centro-Americana cases on the ground that they were decided under English law.

A reading of these cases makes clear that the English courts have consistently given the "perils" clause a broad reading. Several early decisions in this country departed from this view, and held that "perils of the sea" pertained only to extraordinary and calamitous occurrences. See e. g. Hazard's Administrator v. New England Marine Ins. Co., 8 Pet. 557, 583, 33 U.S. 557, 583, 8 L.Ed. 1043 (1834); Arbib & Houlberg, Inc. v. Second Russian Ins. Co., 294 F. 811, 816 (2d Cir., 1923).

We see no reason why we should not seek guidance from English authorities. In so doing, we follow, as we did in Gray, a course recently approved by the Supreme Court:

"\* \* \* [W]e and other American courts have emphasized the desirability of uniformity in decisions here and in England in interpretation and enforcement of marine insurance contracts. Especially is uniformity desirable where, as here, the particular form of words employed originated in England." (Footnotes omitted.) Standard Oil Co. v. United States. 340 U.S. 54, 59, 71 S.Ct. 135, 138, 95 L.Ed. 68 (1950).

passing freighter were unanticipated and extraordinary, and constituted a "peril of the sea" within the meaning of the policy.[3]

## II. "INCHMAREE" CLAUSE

The "Inchmaree" clause was first included in marine insurance policies to overcome the effects of a decision of the House of Lords which was adverse to the assured.[4] Its purpose was, and is, "to broaden, not restrict, to expand, not withdraw coverage." Saskatchewan Government Ins. Office v. Spot Pack, Inc., 242 F.2d 385, 391 (5th Cir., 1957). It is with this beneficial purpose in mind that the clause must be interpreted.

The issue as to coverage under the "Inchmaree" clause is whether such coverage is excluded because Stasch's negligence was "want of due diligence by the owners of the ship, or any of them, or by the manager."

Although the district court included no express finding that Stasch was the "master" of the No. 12 at the time of the accident, its general findings comport such a conclusion, and we hold that Stasch was acting as "master" of the No. 12.

There is considerable doubt in our minds as to whether he was also the "owner" or "manager" within the meaning of the clause, although, as the district court found, his status was that of "owner" for a number of other purposes. It seems to us quite likely that the reason for appellant's informing the insurance company of the charter and for having Stasch added as a named assured was precisely to bring Stasch's negligence under the coverage of the policy, as well as to protect him from a claim of subrogation in case of loss through his negligence. Certainly Stasch himself could

---

3. Appellee cites us to several cases interpreting the phrase "perils of the sea" as used in bills of lading. E. g., Duche v. Thomas & John Brocklebank Ltd., 40 F.2d 418 (2d Cir., 1930; The Rosalia, 264 F. 285 (2d Cir., 1920); The Giulia, 218 F. 744 (2d Cir., 1914); The Warren Adams, 74 F. 413 (2d Cir.), cert. denied, 163 U.S. 679, 16 S.Ct. 1199, 41 L.Ed. 316 (1896); Diethelm & Co. v. S.S. The Flying Trader, 141 F.Supp. 271 (S.D.N.Y. 1956), aff'd 244 F.2d 542 (2d Cir., 1957).

But there is a basic difference between those cases and the present case. A shipowner-carrier defending against a cargo claim can rely on a "perils of the seas" exception in a bill of lading only if he establishes that neither he nor the ship's personnel was negligent—i. e. that the loss resulted from *force majeure*. But the "Perils" clause in a marine hull insurance policy covers loss caused or contributed to by such negligence.

This distinction was explained by the Supreme Court in Liverpool & Great Western Steam Co. v. Phenix Ins. Co., 129 U.S. 397, 9 S.Ct. 469, 32 L.Ed. 788 (1889):

"Collision or stranding is, doubtless, a peril of the seas; and a policy of insurance against perils of the seas covers a loss by stranding or collision, although arising from the negligence of the master or crew, because the insurer assumes to indemnify the assured against losses from particular perils, and the assured does not warrant that

his servants shall use due care to avoid them. [Cases cited.] But the ordinary contract of a carrier does involve an obligation on his part to use due care and skill in navigating the vessel and carrying the goods; and, as is everywhere held, an exception, in the bill of lading, of perils of the sea or other specified perils does not excuse him from that obligation, or exempt him from liability for loss or damage from one of those perils, to which the negligence of himself or his servants has contributed."

129 U.S. at 438, 9 S.Ct. at 470. See also Arbib & Houlberg, Inc. v. Second Russian Ins. Co., 294 F. 811, 816 (2d Cir., 1923).

To the extent that the language in Hecht, Levis & Kahn, Inc. v. New Zealand Ins. Co., 121 F.2d 442 (2d Cir., 1941) fails to recognize this distinction, we deem it to have been overruled by New York, N. H. & H. R. R. v. Gray, 240 F. 2d 460, 466 (2d Cir.), cert. denied, 353 U.S. 966, 77 S.Ct. 1050, 1 L.Ed.2d 915 (1957), where we distinguished the Flying Trader case, supra, on the ground that it involved bills of lading rather than marine insurance.

4. Thames & Mersey Marine Ins. Co. v. Hamilton, Fraser & Co., 12 App.Cas. 484 (1887). The clause takes its name from the Steamship Inchmaree involved in that case.

have had no claim for the loss of the vessel.

But assuming, arguendo, that Stasch was an owner or manager for purposes of the exclusion clause, we are persuaded that that exclusion was not intended to apply to the negligence of an owner who is acting as master in the operation of a vessel at sea.

Although we have found no authority directly in point, the few decisions interpreting the words "owner" and "master" lend support to our conclusion. In Read v. Agricultural Ins. Co., 219 Wis. 580, 263 N.W. 632 (1935), where plaintiff sued on a policy of marine insurance containing an "Inchmaree" clause, the court said:

"There seems to us to be a clear distinction between the activities of a person acting on behalf of the owner in conditioning and launching the boat and those of a master or other officer acting professionally in the handling of the vessel at sea. If the conditioning operations culminate in launching the vessel in an unseaworthy condition, it is clear to us that there is no coverage. If there is negligence in the discharge of some professional duty in connection with handling the boat during the voyage, the 'Inchmaree' clause appears to apply."

263 N.W. at 636. See also Founders' Ins. Co. v. Rogers, 281 F.2d 332 (9th Cir., 1960); Baggaley v. Aetna Ins. Co., 111 F.2d 134 (7th Cir., 1940); Wigle v. Aetna Cas. & Sur. Co., 177 F.Supp. 932 (E.D.Mich.1959); Yacht Buccaneer, 1940 Am.Mar.Cas. 1397 (arbitration, Chicago, 1940); Baxendale v. Fane, 66 Lloyd's List L.R. 174, 181 (1940).

Where the owner or charterer of the vessel also acts as its master, the distinction drawn by the clause can be given effect only if it is read as referring to the function that the owner-master is performing when the acts causing the accident take place. The interpretation urged by the appellee would render the assumption of liability for "negligence of

[the] master" totally ineffective in the present case.

■ The language of the clause as a whole reflects a recognition of the different treatment to be accorded seagoing and preparational carelessness. There is no other explanation for the use of the term "negligence" in referring to the master, and of the term "want of due diligence" in referring to the owner. Clearly the draftsman had quite different operations in mind. We conclude that the Inchmaree clause was designed to insure against seagoing or operational negligence of the master (whether or not he is also the charterer or owner), and to exclude from coverage damage due to the shoreside failure of the shipowner's managerial staff properly to prepare or equip the vessel for the voyage or service she is about to perform.

Since the accident resulted from the operational negligence of Stasch while he was acting as master of the No. 12, appellant was entitled to recover under the policy.

Finally, appellee contends that recovery is precluded by the proof of loss provision of the policy. This provision required the assured to submit proof of loss "that the Assured has used due diligence to prevent * * * loss or damage" as a condition precedent to any right of action of the assured.

■ Not only was the point not raised in the court below, but it is wholly without merit. Even if we assume, contrary to authority, O'Boyle v. Northwestern Fire & Marine Ins. Co., 49 F.2d 713 (2d Cir., 1931), that the insurer did not waive such proof of loss by denying all liability before suit was brought, the "due diligence" of the assured to which the proof of loss provision refers is obviously that diligence required by the "Inchmaree" and "Perils" clauses. Clearly the proof of loss provision was not designed to add substantial new exclusions from the coverage of the policy. "Courts, in giving effect to that provision in an insurance policy, have never

"treated the requirement for a proof of loss as a mere trap for the unwary." Id. at 716.

Reversed and remanded with instructions to enter judgment for libelant.