RUSSELL MINING COMPANY, Inc.,
Plaintiff-Appellee,

v.

NORTHWESTERN FIRE & MARINE IN-
SURANCE COMPANY, Defendant-
Appellant.

No. 15137.

United States Court of Appeals
Sixth Circuit.

Sept. 16, 1963.

Edward Blake Moore, Chattanooga, Tenn. (Alvin O. Moore, Spears, Moore, Rebman & Williams, Chattanooga, Tenn., on brief), for appellant.

Sam J. McAllester, Jr., McAllester & McAllester and Clarence Kolwyck, Chattanooga, Tenn., for appellee.

Before MILLER and WEICK, Circuit Judges, and McALLISTER, Senior Circuit Judge.

McALLISTER, Senior Circuit Judge.

The Russell Mining Company brought an action to recover upon a policy of insurance for the loss of a barge which sank at its mooring in thirty-five feet of water in the Tennessee River on the night of July 10, 1958. The District Court entered a judgment in favor of the plaintiff in the amount of $10,000, and defendant, Northwestern Fire & Marine Insurance Company, appeals.

The background of the case is as follows: The Russell Mining Company was organized to mine and distribute coal from the area of Soddy, Tennessee. All of the coal taken from its mines was loaded in trucks, owned and operated by independent contractors, and transported to the Soddy Creek Landing, where it was weighed, tested, and loaded onto river barges on the Tennessee River. The Mining Company had bought an oil barge, which is the subject of this suit, to be used as a dock onto which trucks could drive to unload coal into river barges moored alongside. The barge, used as a dock, had a heavy wooden deck and a heavy wooden ramp to the shore, to permit trucks to be driven onto it from the shore.

The barge in question was 175 feet long, 26 feet wide, and was constructed

of 5/16 inch steel. Because of leakage, it was necessary to keep two electric pumps on board and working continually in order to keep it afloat. The electric pumps were connected to a central power source on shore, in the coal-weighing office. All pumps were in good working order at the time of the sinking.

On the morning of July 10, 1958, Lawrence Bragg, an employee of the Russell Mining Company, came to the Soddy Creek Landing to supervise the installation of a coal tester for the Company. He brought with him Jewell Withrow, a handy man, to help with the installation. Vincent May, who acted as Manager of the Soddy Creek Landing for the Mining Company, was already there when Bragg and Withrow arrived. All of the coal transported to the Landing was weighed, tested, and loaded onto the river barges under the supervision of May.

The coal tester appears to have been a machine for crushing or pulverizing coal to prepare samples for testing and analysis as to ash content, which had to be submitted to the Tennessee Valley Authority. The coal tester had nothing to do with the barge, and was, in no way, connected to it. It was located on shore in the "weighing office."

The installation of the coal tester included "wiring it up," and changing a motor. The motor which was first attached to it was the wrong type. In installing the motor, it was necessary to place a coal tester switch between the motor and the main source of power. In order to install this coal tester switch, the electricity had to be cut off from the central power source at the main switch, which was also located in the weighing office. The electricity was cut off at the main switch several times during the day by Withrow in order to make tests on the coal tester.

Disconnecting the electricity at the main switch also disconnected everything electrical at the Landing, including the electric pumps on the loading barge. On the evening of July 10, 1958, May was the first to go home, leaving Bragg and Withrow still working on the coal tester. Thereafter, Bragg and Withrow finished the installation of the coal tester, and left for the day together. At the time, the electricity had been, and was, disconnected at the main switch. None of the three men switched on the electricity before leaving. Without electric current, the pumps on the barge were not working. Without the pumps working, water soon entered the barge in sufficient quantity to cause it to sink in 35 feet of water; and no salvage was ever effected.[1]

The Russell Mining Company brought suit to recover insurance on the barge. The policy of insurance, insofar as here applicable, provided:

"This insurance also covers loss of or damage to the vessel named herein directly caused by:

\* \* \* \* \* \*

"Breakdown of motor generators or other electrical machinery and

---

1. Strangely enough, in its declaration, the Russell Mining Company states: "Plaintiff avers that after it had owned said barge for a period of approximately one month, that on July 10, 1958, the plaintiff's employees left the said barge at approximately 5:30 P.M. while moored in the Tennessee River in the vicinity of Sodd, Tennessee, at which time the barge was in good condition and thoroughly seaworthy. At some time the night of July 10th, the barge sank. The plaintiff avers that a direct cause of the sinking was the breakdown of the automatic electrical pump or electrical connections thereto, which loss is specifically covered by the said contract of insurance issued by the defendant insurance company. The plaintiff further avers that some party or parties unknown came aboard said barge and maliciously opened the seacocks of said barge, causing same to ship water and to sink. Such malicious mischief is specifically covered by said contract of insurance." Neither of the above averments was substantiated on the trial, and in the pre-trial order, appellee relied on the provision in the policy regarding breakdown of electrical equipment; but no mention was ever made after the filing of the declaration of malicious mischief on the part of anyone in opening the seacocks of the barge, and thus contributing to the loss.

electrical connections thereto, * * *

"Negligence of charterers or repairers (other than assured in both cases), masters, mariners, engineers or pilots;

provided such loss or damage has not resulted from want of due diligence by the assured, the owners or managers of the vessel, or any of them." [2]

The District Court held that the sinking of the barge was caused by the negligence of appellee's employee, Withrow, in cutting off the electricity to the pumps and leaving it off overnight. The court further held that the negligence of Withrow was an insured risk, since his negligence was that of a "repairer," as that term is used in describing an insured risk under the policy. Moreover, the court found that the failure of the electric pumps, under the circumstances of the case, constituted a "breakdown of motor generators or other electrical machinery and electrical connections thereto," as those terms are used in the policy in describing an insured risk.

■ We are of the view that Withrow was not a "repairer," as that term is used in the policy. The loss of the barge was not directly caused by any repair to it, and any fair reading of the policy, in our view, excepts loss only when caused by a repairer of the vessel. It is to be observed that Withrow made no repairs whatever to the barge, or even any repairs with respect to the coal tester. More than that, the coal tester could have been located in a coal weighing office twenty miles or more away from the shore adjacent to the barge, and the same loss would have occurred, if the barge's electrical pumps and the coal tester were connected to the same central electric power source and the power was cut off at the main switch as in this case. To hold that the installation of a coal tester twenty miles away from the barge (which had no relation thereto) would be repairing the barge, would not be a reasonable conclusion from the language used in the insurance policy; and, yet, there would be no difference in such a situation and the one at bar.

■ Moreover, the sinking of the barge cannot be said to have resulted from the insured risk covering a loss occurring from a "breakdown of motor generators or other electrical machinery and electrical connections thereto." There was no breakdown of motor generators or other electrical machinery and electrical connections thereto. The electric pumps and all other electrical equipment were in good working order at the time the barge sank. If the electric current had not been turned off and left off, by appellee's employee, the sinking would not have occurred. As the trial court found, the sinking was the direct and proximate result of the negligence of appellee's employee in cutting off the electricity to the pumps and leaving it off overnight, which caused the pumps on the barge to stop operating. On the question of the claimed insured risk as to repairers, as well as the claimed insured risk as to the breakdown of motor generators and other electrical machinery and connections, the judgment in favor of appellee must be vacated.

Other interesting questions are discussed by the parties in their briefs and arguments, but we find them unnecessary to decision.

In accordance with the foregoing, the judgment of the District Court is set aside, and the case is remanded for entry of a judgment of no cause of action.

2. The quoted language of the policy is commonly known as the Inchmaree Clause. This clause was first inserted in marine insurance policies to overcome the effects of a decision of the House of Lords which was adverse to the insured. The clause takes its name from the Steamship Inchmaree, which was involved in that case. Thames & Mersey Marine Insurance Co. v. Hamilton, Fraser & Co., 12 App.Cas. 484 (1887). See Allen N. Spooner & Son, Inc. v. The Connecticut Fire Ins. Co., 314 F.2d 753 (C.A.2).