LAWTON vs. THE ROYAL CANADIAN INSURANCE COMPANY.

*September 1 — September 21, 1880.*

MARINE INSURANCE: SPECIAL VERDICT. *(1) Inconsistent findings. (2) Seaworthiness.*

1. A contract of marine insurance upon a steam tug provided that the insurer should not be liable for losses arising from "incompetency of the master or insufficiency of the crew, and want of ordinary care or skill in navigating said vessel." It appeared that the master, while navigating lake Michigan, the fuel being exhausted, let go the anchor in a storm, and with his crew abandoned the tug and went ashore; and that a few hours afterwards the cable parted and the tug was wrecked. In this action upon the policy, the jury found specially that the master did *not* do "all that a skilful, careful and prudent seaman could do to prevent the wrecking of the boat," and that it was his duty "to remain on board of the tug, or leave a man there to attend to the cable;" but to the question, "Did the master leave said boat only when, in his opinion, to stay longer would endanger the life of himself and the crew," they also answered "Yes." On appeal from a judgment in plaintiff's favor: *Held*, that the findings are so inconsistent as to require a new trial.

2. To render a ship "seaworthy," within the meaning of a contract of insurance, she must be sufficiently furnished with proper cables and anchors.

APPEAL from the Circuit Court for *Brown* County.

Action on a policy of marine insurance upon the tug Ormsby. The defense was, that the loss was caused by the unseaworthy condition of said tug, and by the negligent and unskilful manner in which she was handled. There was a special verdict, and judgment thereon for the plaintiff. Those parts of the verdict which are important here, are recited in the opinion. Defendant appealed from the judgment.

For the appellant there was a brief by *J. C. & A. C. Neville*, and oral argument by *J. C. Neville*.

For the respondent there was a brief by *Hudd & Wigman*, and oral argument by *Mr. Hudd*.

COLE, J. The findings of the jury in this case, upon material questions submitted to them, are so inconsistent with each

other as to require a new trial. It was, of course, the plain duty of the master of the tug to do whatever a prudent, skilful seaman, in the exercise of a sound judgment, would have done under the circumstances to prevent the loss of the vessel. This was the express provision of the contract. Now, the fifth question submitted at the request of the plaintiff was this: "Did the master then in command of the boat Ormsby do all that a skilful, careful and prudent seaman could do to prevent the wrecking of the boat?" *Answer.* "No." Again, the second question submitted at the request of the defendant was: "Should the captain have remained on board the tug while at anchor, and would it not have been the proper thing for him to have remained on board of the tug?" *Ans.* "Yes." The seventh question submitted by the defendant was this: "Was it not the captain's duty to remain on board of the tug, or leave a man there to attend to the cable?" *Ans.* "Yes." The materiality and importance of these questions as bearing on the defense are too obvious to require comment. It appeared that the captain, while navigating a tributary bay of Lake Michigan, exhausted his fuel and was unable to proceed on his trip. He let go his anchor in a storm, and, with the two men constituting the crew, abandoned the tug and went ashore. The cable parted in a few hours afterwards, and the tug was wrecked. The jury say, in their answers to the above questions, that the captain did not do all that a skilful, careful and prudent seaman could do to prevent the wrecking of the boat, and they specify, as an act of negligence or failure to perform his duty, his omission to remain on board the tug or leave a man there to attend to the cable and keep it parcelled in order to prevent it from separating. This is the meaning of these findings, when considered with reference to the evidence. Intelligent and experienced seamen had testified that this was what the captain should have done under the circumstances, and the jury find that he failed to perform his duty in that regard. This misconduct of the captain would release

the insurer from liability for the loss if the case stopped here. For it is unnecessary to add that the owner of the tug was bound to have a sufficient crew, and a master of competent skill and experience, to navigate the vessel in the business in which she was employed; and the master was bound to do what good seamanship required should be done to prevent a disaster in any emergency in which he might be placed. All this is implied by seaworthiness of the vessel, and it is what was in effect stipulated for in the policy.

So, in view of the above findings, the defendant would not be liable for the loss. But the sixth question submitted at the request of the plaintiff was: "Did the master of said Ormsby leave said boat only when in his opinion to stay longer would endanger the life of himself and the crew?" *Ans.* "Yes." Now it seems to us that this finding is quite inconsistent with those just referred to; for if the master was a seaman of ordinary courage, judgment and experience, and thought the danger of remaining on the tug was so great as to justify him in abandoning it, then surely he was guilty of no negligence in not remaining on the tug to attend to the cable. Certainly it was not his duty, if exposed to imminent peril, to risk his life, or the life of any one of his crew, for the purpose of saving the vessel. Hence it seems to us the several findings of the jury cannot well stand together. In one breath the jury say the master did not leave the boat until in his judgment to stay longer would endanger the life of himself and crew; and in the next that it was his duty to have remained on board the tug, or have left a man there to attend to the cable. The case comes within the ruling in *Haas, Adm'r, v. The C. & N. W. Railway Co.*, 41 Wis., 44, and *Kearney, Adm'r, v. The C., M. & St. P. Railway Co.*, 47 Wis., 144, where a new trial was ordered on account of the inconsistency of the special findings.

Before leaving the case we deem it proper to make a remark on the answer to the sixth question submitted on the part of

the defendant. That finding is, that the tug was anchored in a place that was safe in any storm if she had had sufficient ground tackle. There was considerable evidence given on the trial, which tended to show that a tug of the size of the one in question, which was used in towing logs on the waters of Green Bay and Bay de Nocque, in order to be seaworthy, should always have a chain cable. In this case the cable was a rope two inches in diameter, which the witnesses agree in saying was liable to chafe and separate in great stress of weather, unless it was kept parcelled. The above finding would warrant the inference that if the tug had had a good chain cable, or had been furnished with sufficient ground tackle to encounter the dangers of the waters she was employed in navigating, she might not have been lost. To render a ship seaworthy for the service or use intended by the insurance, she must not only be sufficiently staunch and sound, and adequately constructed, but be sufficiently furnished with the necessary cables and anchors. 1 Kay's Law of Ship-Masters, 90. In *Wilkie v. Geddes*, 3 Dow, 57, a ship was held to be unseaworthy where it appeared that the best bower anchor and the cable of the small bower anchor were defective. Lord ELDON, in giving his opinion in the House of Lords, says, nothing is more clear than that there is an implied warranty, in every contract of marine insurance, that the ship is seaworthy at the commencement of the risk, or at the time of her sailing on the voyage insured, and is provided with sufficient ground tackle to encounter the ordinary perils of the sea. Indeed, the law seems to be perfectly well settled on this point, as a reference to works on insurance will show. *The Merchants' Mut. Ins. Co. v. Sweet*, 6 Wis., 670, and cases cited. The evidence on another trial may satisfy the jury that the tug was furnished with a proper and sufficient cable, and was seaworthy in that respect; but we infer the jury seem to have thought, from the evidence given, that she was not provided with suitable and sufficient ground tackle, in finding as they did in

answer to the sixth question. But we will not dwell longer upon the point, as the evidence upon another trial may be different.

*By the Court.*— The judgment of the circuit court is reversed, and a new trial ordered.