READ, Respondent, vs. AGRICULTURAL INSURANCE COMPANY, Appellant.

*November 6—December 3, 1935.*

582

For the appellant there were briefs by *Rouiller, Dougherty, Arnold & Kivett* of Milwaukee, and oral argument by *Suel O. Arnold.*

For the respondent there were briefs by *Bitker, Tierney & Puchner* of Milwaukee, and oral argument by *Joseph E. Tierney.*

WICKHEM, J.   The question upon this appeal has to do with the scope or coverage of a policy of marine insurance.

Plaintiff is the owner of the cruiser "Rendezvous."   The boat was delivered to plaintiff in July, 1929.   Prior to that time plaintiff procured the policy of insurance issued by defendant.   Renewal policies were thereafter issued, and the last renewal was in full force and effect during the month of June, 1932.   In the fall of 1931 plaintiff delivered his yacht to the Burger Boat Company at Manitowoc for storage.   In April, 1932, plaintiff made arrangements with the boat company to recondition the boat for the 1932 season.   Plaintiff had no control over this work.   When the work was completed, the Burger Boat Company launched the boat, but through some neglect failed to close the drain valve of the reduction gear and to connect the hose of the water system. As a result, water was permitted to flow freely into the hull, causing the ship to become partly submerged.

No question is raised concerning the award of damages, and it may be taken that the amount of $2,700 set by the jury represents the sum necessary to repair the damage caused by the sinking.

The situation, then, is that a vessel, seaworthy so far as its design and general condition with respect to wear and tear are concerned, was by the neglect of independent contractors launched with its valves open, causing it to sink in calm waters without the intervention of a storm or other unusual disturbance of the sea.   The sole question is whether the peril involved is covered by the policy.

Policies of marine insurance are quite unique in that language usual in such policies issued in the sixteenth century is still retained. In *Marsden v. Reid* (1803), 3 East, 572, Mr. Justice LAWRENCE said:

"It is wonderful, considering how much property is at stake upon instruments of this description, that they should be drawn up with so much laxity as they are, and that those who are interested should not apply to some man whose habits of life and professional skill will enable him to adapt the words of the policy to the intention professed by the parties. In construing these instruments we must always look for what was the intention of the parties, without confining ourselves to a strict grammatical construction; for it is impossible in many instances so to construe them, without departing widely from the object intended."

Again, in *Le Cheminant v. Pearson* (1812), 4 Taunt. 367, Chief Justice MANSFIELD said:

"This policy of insurance is a very strange instrument, as we all know and feel."

These policies offer some difficulties in construction if reliance is to be wholly upon the somewhat archaic language employed. However, nearly every clause contained in them has been construed by courts during the past three hundred years, and as a result, these clauses have acquired an established sense or meaning which in many instances can only with the greatest of difficulty be arrived at by a mere consideration of the words of the policies. Winter, Marine Insurance (1919), p. 151; *Union Marine Ins. Co. v. Charles D. Stone & Co.* (C. C. A.), 15 Fed. (2d) 937.

Three provisions of the policy in question are important and have some bearing upon the coverage stipulated. The two clauses purporting to deal with coverage and which have any materiality here are as follows:

"Touching the adventures and perils which we, the said assurers, are contended to bear and take upon us, they are

of the Seas, Men-of-War, Fire, Enemies, Pirates, Rovers, Assailing Thieves, Jettisons, Letters of Mart and Counter-mart, Surprisals, Takings at Sea, Arrests, Restraints and Detainments of all Kings, Princes, and People, of what nation, condition or quality soever, Barratry of the Master and Mariners, and all other perils, losses and misfortunes that have or shall come to the hurt, detriment or damage of the said vessel, etc., or any part thereof."

"This insurance also to cover subject to the special terms of this policy, loss of and/or damage to hull or machinery through the negligence of master, mariners, engineers, or pilots or through explosions, bursting of boilers, breakage of shafts, or through any latent defect in the machinery or hull, provided such loss or damage has not resulted from want of due diligence by the owners of the vessel, or any of them, or by the manager."

The second clause, frequently referred to as the "Inch-maree" clause, was quite generally added to marine policies as a consequence of the decision in *Hamilton, Fraser & Co. v. Thames & Mersey Marine Ins. Co.* (1886), 17 Q. B. D. 195. The effect of this clause will be considered in a later part of the opinion.

The principal coverage clause begins with a recitation of the perils insured against. It starts with the phrase: "They are of the seas;" continues with a list of named perils, and concludes with a clause "and all other perils, losses and misfortunes that have or shall come to the hurt, detriment or damage of the said vessel, etc., or any part thereof." This latter provision is strongly relied on by plaintiff. However, under the principle *ejusdem generis,* the scope of this clause is modified by the specific perils set forth in the preceding clause, and covers only perils similar in kind to the perils specifically mentioned in the same paragraph. See 2 Arnould, Marine Insurance (11th ed.), p. 1111; also *Cullen v. Butler* (1816), 5 M. & S. 461; *Butler v. Wildman* (1820), 3 Barn. & Ald. 398; *Phillips v. Barber* (1821), 5 Barn. & Ald. 161; *Devaux v. J'Anson* (1839), 5 Bing. N. C. 519.

Since the peril which occasioned the damage here involves neither men-of-war, fire, enemies, pirates, etc., we are confronted with the necessity of ascertaining the nature and scope of "perils of the sea." It is generally held that a peril whose only connection with the sea is that which arises aboard ship, is not a peril of the seas. *Wilson, Thomas, Sons & Co. v. The Owners of Cargo Xantho* (1887), 12 App. Cas. 503.

The peril must be of the sea and not merely one occurring on the sea. In *Grant, Smith & Co. and McDonnell Limited v. Seattle Construction & Dry Dock Co.* 122 L. T. Rep. 203, (1920) A. C. 162, Lord BUCKMASTER declared:

"It is not desirable to attempt to define too exactly a 'marine risk' or a 'peril of the sea,' but it can at least be said that it is some conditions of sea or weather or accident of navigation producing a result which but for these conditions would not have occurred." "An insurance against 'the perils of the sea or other perils,'" he added, "is not a guarantee that a ship will float, and in the same way in the present case had such a policy been effected it would not have covered a loss inevitable in the circumstances due to the unfitness of the structure, and entirely dissociated from any peril by wind or water."

Again, in *Mountain v. Whittle,* 125 L. T. Rep. 193, (1921) A. C. 615, it was said:

"If the water was in a normal condition and got into the houseboat simply owing to the defective character of the seams there would be no loss by peril of the seas—the loss would have been by the defective condition of the vessel. A loss caused by the entrance of sea water is not necessarily a loss by perils of the seas. There must be some special circumstance, such as heavy waves causing the entrance of the sea water, to make it a peril of the seas."

The rule has been laid down that a policy insuring against perils of the sea covers only extraordinary risks such as "stress of weather, winds and waves, lightning, tempests,

rocks, etc." *Hazard's Admr. v. New England Mar. Ins. Co.* 8 Pet. 557, 585. But this it has been held does not mean that the peril must be extraordinary in the sense of arising from causes that are uncommon and could not be reasonably anticipated. See also *E. D. Sassoon & Co. v. Western Assurance Co.* (1912), A. C. 561, 25 Am. & Eng. Cas. 1037; 2 Arnould, Marine Insurance (11th ed.), p. 1048.

It is obvious enough in this case that no unusual action of the sea caused the loss of this vessel. The loss was caused by negligent failure to launch the ship in a seaworthy condition. It is generally held that in order to recover a vessel must be seaworthy when it is sent to sea. This is not a mere application of the doctrine usually held that there is an implied warranty of seaworthiness on the part of the owner, but rather of the principle that where a ship sinks because of its unseaworthiness, it has not been lost by a peril of the sea. In connection with this, see *Gulf Transportation Co. v. Firemen's Fund Ins. Co.* 121 Miss. 655, 83 So. 730, 9 A. L. R. 1307; *Cary v. Home Ins. Co.* 235 N. Y. 296, 139 N. E. 274; *New Orleans, T. & M. R. Co. v. Union Marine Ins. Co.* (C. C. A.), 286 Fed. 32; 2 Arnould, Marine Insurance (11th ed.), p. 1027, sec. 799; *Plummer v. Ins. Co. of North America,* 114 Me. 128, 95 Atl. 605; and *Smith v. Northwestern Fire & Marine Ins. Co.* 246 N. Y. 349, 159 N. E. 87. In the latter case Judge CARDOZO said:

"Here the vessel when it started was unseaworthy for the first stage of the adventure as well as for the others. That being so, the insurance ceased to be effective at the moment of her sailing."

It is our conclusion that the clause under consideration, standing alone, does not include or cover the peril resulting in the sinking of this vessel.

This policy was a time policy and not a voyage policy. That is to say, it insured the risk over a specified period of

time and not for the period of a particular voyage. The clause in the policy specifying time and places to which the coverage is applicable is as follows:

"Beginning the adventure upon the said vessel, as above, and so shall continue and endure during the period aforesaid, in port and at sea, in docks and graving docks, and on ways, gridirons and pontoons, at all times, in all places, and on all occasions, under sail, steam or other power."

Plaintiff claims that this clause enlarges the coverage of the clause heretofore considered, because it specifically provides that the policy shall apply "in docks and graving docks, and on ways, gridirons and pontoons," etc. Plaintiff contends that if the policy is to apply to a vessel in dry dock, this indicates that something other than perils of the sea are covered by the policy. We deem this contention unsound. The clause in question applies to perils insured against, no matter where the vessel is when subjected to the peril. It relates to time and place and not to scope of coverage. For example, should a ship in dock or in port be injured by a storm or tidal wave, or captured by pirates, the location of the ship would in no manner detract from the liability of the insurers, since the peril is one insured against. Except for this clause, it might be contended by the insurers that a ship which is grounded in any form or manner is not covered by the policy. We conclude that this clause neither adds to nor subtracts from the coverage specified by other paragraphs of the policy.

It now becomes necessary to consider the scope of the "Inchmaree" provision, heretofore quoted. That provision was generally inserted in policies following the *Thames Case, supra.* In that case a donkey pump on the steamer "Inchmaree" was injured, and an attempt was made to recover for the injury under the provision of the policy insuring against "all other perils." The court there applied the doc-

trine of *ejusdem generis* and refused recovery.   Thereafter, the "Inchmaree" clause was usually inserted in this type of policy and covers damages resulting to the ship through the negligence of master, mariners, engineers, and pilots, or through explosions, bursting of boilers, breakage of shafts, or through any latent defect in the machinery or hull, provided the owner or his managers were not wanting in diligence.

If this clause is to be effective to establish defendant's liability, it must be because the injury to the vessel resulted from the negligence of "master, mariners, engineers and pilots," occurring without want of diligence on the part of plaintiff or his "managers."   That there was no actual want of care on the plaintiff's part is clear.   That the negligence was that of an independent contractor may be assumed without extended discussion.

The difficulty with plaintiff's position is that the boat company is not within the description of persons whose negligence is insured against, and that even if it were described by the "Inchmaree" clause, the character of the act with reference to which the negligence occurred removes it from the coverage of the policy.   There seems to us to be a clear distinction between the activities of a person acting on behalf of the owner in conditioning and launching the boat and those of a master or other officer acting professionally in the handling of the vessel at sea.   If the conditioning operations culminate in launching the vessel in an unseaworthy condition, it is clear to us that there is no coverage.   If there is negligence in the discharge of some professional duty in connection with handling the boat during the voyage, the "Inchmaree" clause appears to apply.   Since, however, coverage is conditioned upon the seaworthy character of the vessel at the outset, the owner may not avoid this condition by delegating to others the work of putting the vessel into shape, or

avoid the defense of unseaworthiness by showing the exercise of due care. The purpose of the "Inchmaree" clause is to add to the coverage a peril theretofore excluded from the "other perils" clause by operation of the principle *ejusdem generis*. It does not affect the requirement that the vessel be seaworthy at the inception of the voyage.

This distinction is recognized in *Merchants' Mutual Ins. Co. v. Sweet,* 6 Wis. * 670. In that case the master sailed with insufficient ballast, and as a result the ship capsized. This court held that since there was a duty of the master to see that the ship was properly ballasted, and that since there was an implied warranty of seaworthiness, a loss occasioned by the master's default was not covered by the policy, even though it was shown that the officers and agents of the owners, other than the master, were at fault. The court said :

". . . There are undoubtedly certain mistakes of judgment and instances of negligence on the part of officers or crew which the underwriters are responsible for. A loss occasioned by a mistake of judgment or neglect of duty on the part of a commanding officer, while acting purely in his official and professional character, may be one of the perils covered by the policy. Or such a default as that instanced by the court in this case, where the master raised too much sail or neglected to have the pumps properly worked, in consequence of which the vessel was lost, is a risk incident to navigation, and assumed by the insurers. A distinction seems to be taken in the cases, and may well exist between those acts of the master which are purely professional, and those which he must be regarded as performing in the character of agent of the owners. . . ."

See also *Lawton v. Royal Canadian Ins. Co.* 50 Wis. 163, 6 N. W. 505.

It is our conclusion that the damage to the plaintiff's vessel was not covered by the policy.

It is urged by plaintiff that in the event of such a holding, the record be remanded for further proceedings upon the second cause of action. Plaintiff did not appeal from the

portion of the judgment dismissing the complaint as to the Roberts Company, agent and codefendant of the defendant insurance company, and the Roberts Company is not a party to this appeal. Nor has there been filed a motion to review. Under these circumstances, the only matter before the court upon this appeal is the judgment in plaintiff's favor upon the policy.

*By the Court.*—Judgment reversed, and cause remanded with directions to dismiss plaintiff's complaint.