WISCONSIN BUILDERS, INC., Appellant, v. GENERAL INSURANCE COMPANY OF AMERICA, Respondent.

*No. 191. Argued September 3, 1974.—Decided October 3, 1974.*
(Also reported in 221 N. W. 2d 832.)

For the appellant there was a brief by *Grodin & Strnad*, of Milwaukee, a reply brief by *Burton A. Strnad* of Milwaukee, and oral argument by *Burton A. Strnad*.

For the respondent there was a brief by *Arnold, Murray & O'Neill*, all of Milwaukee, and oral argument by *James P. O'Neill*.

CONNOR T. HANSEN, J.

The apartment was being constructed at the foot of a bluff in an "L" shape so that the corner of the bluff bisected the inside angle of the "L." One wing of the building ran north and south along the west side of the bluff; the other wing ran east and west along the south side of the bluff.

On August 14, 1969, when construction of the apartments had reached the point of installing the interior drywall, the most easterly one third of the east wing of the building located along the south side of the bluff collapsed. By pretrial stipulation, the parties agreed that the policy in question was in full force at the time of the collapse and covered the damage unless one or both of the following exclusions applied:

"V.  **Exclusions**
"This policy does not insure under this form against:
"C.  Loss caused by, resulting from, contributed to or aggravated by any of the following:
"1.  earth movement, including but not limited to earthquake, volcanic eruption, landslide, mudflow, earth sinking, earth rising or shifting;
"D.  Loss caused by or resulting from error, omission or deficiency in design, specifications, . . ." [1]

The building was commenced in the fall of 1968, at which time the bluff was partially excavated, leaving almost a vertical rise behind the building site. In Decem-

---

[1] The question of design deficiency is not before this court on appeal.

ber, 1968, work on the project was ordered stopped by the department of industry, labor & human relations because of concern over the safety of people working beneath the vertical cliff. Some 14 feet of driveway adjacent to another apartment complex previously built by plaintiff and located on top of the bluff had broken off and slid down the west side of the bluff toward the north wing of the building in question. Corrective measures were taken by building a telephone pole "crick" in the west bank of the bluff to prevent further erosion and by cutting back the bluff to change the angle of repose. Construction was allowed to recommence early in 1969 and continued without further interruption until the collapse, damaging the other or east wing of the building which is the subject of this litigation.

Between December, 1968, and August, 1969, much concern was expressed about the continuing instability of the bluff, including the south side immediately above that portion of the building which subsequently collapsed. Robert S. Schley, a real estate appraiser hired by the financing bank, West Federal Savings & Loan Association, to monitor the work and make recommendations as to the release of funds for the project, visited the site four times between May, 1969, and the date of the collapse. Each time he reported concern over what he termed "severe bank slippage" on the south slope of the bluff. Schley testified that he repeatedly warned the bank and the plaintiff of this condition and recommended the installation of a retaining wall around the complete bluff. Schley's final report in this regard was made the day of the collapse based on his inspection of the site that morning.

Willard Van Handel of the department of industry, labor & human relations also testified as to large cracks in the top of the bluff, including the area above the building in question, which he observed in his four to five

inspections subsequent to December, 1968. While his reports showed no notations of bank slippage, additional terracing and filling was done on the south side of the bluff in May, 1969, at his department's suggestion.

Witnesses called by the plaintiff testified they did not believe the bluff to be unstable. Leon V. Sniegowski, a loss control representative for the defendant, called adversely by the plaintiff, testified that only fill dirt from the upper parking lot had washed out in December, 1968; that no movement of the original hill had occurred; and that any additional erosion would be controlled by the terracing that was contemplated. He also stated that the distance on top of the bluff from the edge of the south side to the nearest upper apartment building remained a constant 12 feet through June, 1969, the time of his last inspection. Sniegowski saw no slides or cracks in the bluff during his June inspection. Robert D. Trebilcox, president of the plaintiff company, testified that in May and June he saw no severe bank slippage but merely erosion caused by improperly directed water spouts from the apartments on top of the bluff. Kenneth Leathers, plaintiff-company's superintendent at the building site, corroborated Trebilcox's testimony.

At the suggestion of the department of industry, labor & human relations, it was decided to do additional filling and terracing of the bluff after that done in May, 1969. The May filling had raised the level of the dirt behind the north wall of the east wing to approximately 10 feet. The building plans called for backfilling to this height. Additional fill was ordered and was brought in on August 13th and 14th to fill the terrace behind or north of the east wing. This fill raised the level behind the wall to 14 feet and the intention was to terrace the fill back up the bluff leaving the level behind the wall at 10 feet. On the two days in question, the fill was being deposited all along the north wall of the east wing by dumping it off

the top of the bluff, letting it slide down the south side of the hill and then moving it around at the bottom, using a bulldozer. There was testimony that on August 13th the bulldozer was working within six feet of the north wall which subsequently collapsed. The filling continued on August 14th until mid-day when the north wall started tilting. The fill which had been deposited was resting against the building as they had not yet started terracing it back up the bluff.

There were three eyewitnesses to the collapse of the building who testified at the trial. Warren Gollin, secretary of the plaintiff company, stated that he observed cracks in the cement floor of the building at 1:30 p. m. He saw the north wall slowly tilt toward the south, taking five or six hours to fall over. He further stated he saw no earth movement on the bluff before the wall started to tilt, but that the earth fill seemed to follow the wall as it fell over. He saw no cracks or erosion in the bluff before the wall started to tilt. Leathers, the construction superintendent, stated that he saw Allen Wunderlich, the excavator, dumping fill which created a gradual slope from the top of the bluff down to the north wall. He saw the floor cracks and determined that too much earth pressure was being exerted against the north wall. He called for a backhoe to dig the dirt away from the wall and relieve the pressure. He saw no landslide or earth movement down the bluff but rather described the slow movement of the wall as if a glacier was pushing behind the wall. Leathers went to the top of the bluff after the collapse and noted that 12 feet of the bluff table had cracked and moved straight down as if it had settled leaving the top soil still intact. Wunderlich, the third eyewitness and the excavator at the site, stated he saw no movement of earth behind the north wall or on the bluff before or as the wall was tipping. He left the site about an hour after the wall started to tilt.

Witnesses who arrived shortly after the building collapsed or on the next day were nearly unanimous in what they observed. There was a good deal of earth behind and on top of the collapsed north wall. Trebilcox said that it was primarily fill earth not earth from the bluff. This was confirmed by soil samples taken some time later. Other testimony indicated that a large portion of the bluff had fallen down either before or after the collapse of the wall but no witness could specify when. Richard L. Atkins, the building and heating inspector for the city of Appleton, stated that of the original 18 feet of table land on the bluff above the collapsed building prior to August 14th, only eight feet remained on the evening of the 14th. Van Handel stated he saw evidence of a portion of the bluff still cracking and moving on August 15th.

Finally, three witnesses testified as to an opinion concerning causation. Trebilcox, an engineer, stated that he believed excessive filling above the originally proposed 10 foot height plus too much heavy equipment working too closely to the structure had increased the earth pressure on the north wall, causing the collapse. L. Michael Kenney, the registered professional engineer who designed the building, concurred. Dr. William Thomas Painter, a professor of soil mechanics and foundation engineering at the University of Wisconsin-Milwaukee, also concurred, noting that the additional fill with a gradual slope up the bluff, as existed on August 14th, would have increased the earth pressure on the wall up to two times that which the wall had withstood since May when backfilled to only the 10 foot height. Painter further stated that a landslide would have tipped the wall in the opposite direction. Painter conceded that if a 12 foot piece of the bluff had broken off and slid toward the north wall, it was possible that similar damage could have occurred because of the increased earth pressures caused thereby. He felt, however, that such earth move-

ment would have been readily detectable by anyone watching.

The case was submitted to the jury on special verdict, and the questions of the verdict relevant to this appeal are:

Question No. 1 (as requested by the defendant), reads in part:

". . . At or immediately prior to the collapse of the building in question, was the loss created by, resulting from, contributed to or aggravated by any of the following:

"earth movement, including but not limited to earthquake, volcanic eruption, landslide, mudflow, earth sinking, earth rising or shifting?"

Question No. 2 reads as follows:

". . . If you answer Question No. 1 'Yes', then answer this question:

"Was such loss the cause of the damage sustained by the plaintiff?"

Question No. 5, in part, called for a sum of money necessary to compensate the plaintiff for damage caused by the collapse.

At the close of the evidence the trial court instructed the jury that "earth movement" means any movement of earth "whether it be up, down or sideways." It further instructed that "landslide" means a sliding mass of earth or rock in its natural state and that "backfill" was not to be included in the definition of either earth movement or landslide. The jury was also instructed to disregard the remaining phrases in Question No. 1 of the special verdict, to wit: earthquake, volcanic, eruption, mudflow, earth sinking, earth rising or shifting, because they were not involved in the case. Finally, the court instructed the jury that the term "cause" as used in *Question No. 2* of the special verdict means the sole initiating force that puts all other forces into motion, and that if they should

find that there were other contributing causes to the collapse not excluded by the policy, then they should answer the question "No."

The jury evidenced some confusion concerning the instructions and the special verdict. Defendant had conceded that the value of the collapsed portion of the building was $28,000. This fact was communicated to the jury by special instruction of the court after the jury requested additional instruction on the question. Nevertheless, the jury answered the relevant portion of Question No. 5, "None."

The jury answered Questions No. 1 and 2 of the special verdict, "Yes." On motions after verdict, the plaintiff moved that these answers be changed from "Yes" to "No" based on an insufficiency of evidence to support the verdict, and because the backfilling of August 13th and 14th was necessarily a contributing cause of the collapse. In the alternative, plaintiff moved for a new trial because the wording of these questions was likely to have caused confusion, and for a new trial in the interest of justice. Plaintiff further moved to have the conceded damage figures inserted as answers to Question No. 5 in lieu of the jury's answer of "None." The trial court granted plaintiff's motion concerning Question No. 5, but denied all remaining motions of plaintiff. This appeal follows.

The following issues are dispositive of this appeal:

1. Was it prejudicial error to permit the jury to consider "earth movement" without limiting the term to mean landslide or other movement of the same or similar nature?

2. Were Questions No. 1 and 2 of the special verdict properly formulated so as not to be prejudicially confusing and misleading?

3. Should a new trial be granted as to Questions No. 1 and 2 of the special verdict?

*Scope of term "earth movement."*

Plaintiff contends that the trial court erred in submitting the general term "earth movement" for the jury's consideration having defined it as broadly as "any movement of earth whether it be up, down or sideways." Plaintiff reasons that the relevant exclusion of the insurance policy is ambiguous and hence should be construed under the doctrine of *ejusdem generis* so as to limit the meaning of "earth movement" to the same class of forces as those specifically set forth in the exclusion. Without such a limitation, it is argued that the jury was permitted to find against plaintiff based on a cause which was outside the intended scope of the policy exclusion.

Defendant, on the other hand, maintains that the term "earth movement" is without ambiguity and that the trial court instructed the jury as to its plain, ordinary and popular meaning. Question No. 1 of the special verdict was merely a restatement of the policy exclusion, the applicability of which was the central issue in the case.

Several courts have considered the proper construction to be given the exclusion clause here in issue. In *Stewart v. Preferred Fire Ins. Co.* (1970), 206 Kan. 247, 477 Pac. 2d 966, relied upon by the defendant, the Kansas court stated in dicta that the clause was unambiguous and that the words must be read in their plain, ordinary and popular sense. *Stewart, supra,* page 249. In that case, the exclusion applied through the specific term "earth sinking," as plaintiff's house had fallen into a mine shaft when the supporting soil under and around the foundation gave way. Thus the court was obligated neither to reach the question of ambiguity nor to define the term "earth movement."

The majority of the courts which have considered this particular exclusion have found it to be ambiguous and

have applied the doctrine of *ejusdem generis* to limit the definition of "earth movement." [2]

A leading case is *Anderson v. Indiana Lumbermens Mut. Ins. Co.* (La. 1961), 127 So. 2d 304. In that case it was alleged that plaintiff's house was breaking up because of expansion and contraction of the soil below. The policy excluded loss "caused directly or indirectly by earthquake, or other earth movements except landslides." Noting that "earth movement" was entirely too general and too ambiguous a term, *Anderson,* at page 308, and that it was the court's policy to construe ambiguous terms against the insurer so that policy exclusions would be specific rather than general, *Anderson* at page 306, the court applied the doctrine of *ejusdem generis* to limit the scope of "other earth movements" to the same class or nature of peril as earthquake and landslide. *Anderson, supra,* pages 308, 309.

In other cases following the *Anderson* rule, the exclusionary clause has been more nearly the exact wording in issue. In no instance has the ruling court felt constrained by the normal technicality of the *ejusdem generis* rule that the general words follow the specific. *See e.g., Gullett v. St. Paul Fire & Marine Ins. Co.* (7th Cir. 1971), 446 Fed. 2d 1100; *Wyatt v. Northwestern Mut. Ins. Co. of Seattle* (D. C. Minn. 1969), 304 Fed. Supp. 781; *Government Employees Ins. Co. v. DeJames* (1970), 256 Md. 717, 261 Atl. 2d 747.

In *Wyatt, supra,* page 783, the court was particularly persuasive as to its reasons for adopting the *ejusdem generis* construction:

". . . It seems hard to contend that the insurance policy meant to exclude all earth movements, for it is difficult to distinguish between a situation where a piece of heavy equipment breaks loose and hits a house causing serious damage and a situation where that equipment instead hits only an embankment next to a house but

---

[2] *See:* Annot. (1972), 44 A. L. R. 3d 1316.

causes the earth to move and thereby damages the house. Certainly not all earth movements, or at least those where some human action causes such are included in the exclusion. If this interpretation creates an ambiguity in the language then it is necessary to decide what earth movements were intended to be covered. . . ."

The Wisconsin law concerning the construction of insurance contracts is in accord with the law of those jurisdictions which have applied the *ejusdem generis* rule to the exclusionary clause in question. It is fundamental that no contract of insurance should be rewritten to bind the insurer to a risk which it did not contemplate and for which it has not been paid. However, in the event of ambiguity or obscurity, the language is to be construed against the insurance company which drafted the policy. *Inter-Insurance Exchange v. Westchester Fire Ins. Co.* (1964), 25 Wis. 2d 100, 104, 130 N. W. 2d 185; *Lontkowski v. Ignarski* (1959), 6 Wis. 2d 561, 95 N. W. 2d 230. Further, all provisions, conditions or exceptions which tend to limit the liability of the insurer should be construed most strongly against it. *Meiser v. Aetna Casualty & Surety Co.* (1959), 8 Wis. 2d 233, 238, 98 N. W. 2d 919; *Kelly v. Fidelity Mut. Life Ins. Co.* (1919), 169 Wis. 274, 275, 172 N. W. 152. In addition, this court has upon previous occasions recognized the applicability of the *ejusdem generis* rule in construing overly broad and ambiguous terms in insurance contracts. *Read v. Agricultural Ins. Co.* (1935), 219 Wis. 580, 263 N. W. 632.

In the present case, the trial court by defining "earth movement" to include all movements of the earth whether it be up, down or sideways, left the jury with too broad a class of forces excludable under the policy. The principle of *ejusdem generis* should apply and the trial court should have properly instructed the jury as to the limitation on the definition of the term "earth movement."

*Form of the special verdict.*

Plaintiff contends that Question No. 1 of the special verdict was prejudicially confusing and misleading because it included as possible causes to be considered by the jury, forces upon which no evidence was offered. The defendant, on the other hand, maintains that Question No. 1 was an exact reproduction of the policy exclusion language which served as the crux of the issue in the case and was therefore properly put to the jury. In addition, defendant contends that any error committed by listing causes on which no evidence was presented was cured by the trial court's instruction to disregard those causes in answering the question. The instruction as given would have the jury consider "landslide" and "earth movements" as the only causes which would prevent recovery under the policy.

In Wisconsin, the form of the special verdict normally rests in the sound discretion of the trial court, not to be interfered with so long as the issues of fact in the case are covered by appropriate questions. *Dahl v. K-Mart* (1970), 46 Wis. 2d 605, 609, 176 N. W. 2d 342. However, it is also true that in drafting a special verdict the trial court is to eliminate from the issues raised in the pleading those that are determined by a failure of proof before sending the questions to the jury. *Dahl, supra,* page 609; *Bell v. Duesing* (1957), 275 Wis. 47, 53, 80 N. W. 2d 821. In *Gilbert v. United States Fire Ins. Co.* (1970), 49 Wis. 2d 193, 206, 207, 181 N. W. 2d 527, this court stated that a verdict question not presented by the evidence would be grounds for a new trial if it were found to be prejudicially misleading. *See also: Behning v. Star Fireworks Mfg. Co.* (1973), 57 Wis. 2d 183, 203 N. W. 2d 655; *Quick v. American Legion 1960 Convention Corp.* (1967), 36 Wis. 2d 130, 152 N. W. 2d 919; *Hoffman v. Regling* (1935), 217 Wis. 66, 258 N. W. 347.

In the present case it would be difficult to determine whether the inclusion of the surplus causes in Question

No. 1 would be sufficiently misleading as to be termed reversible prejudicial error. In the first instance this court is always willing to assume that the jury has not disregarded the instructions of the trial court. *Ven Rooy v. Farmers Mut. Automobile Ins. Co.* (1958), 5 Wis. 2d 374, 92 N. W. 2d 771. On the other hand, it is obvious that the jury experienced difficulty in applying the trial court's instructions as is evident from the confusion surrounding the answer to special verdict Question No. 5 with regard to the damages. Under the circumstances it would have been more correct to eliminate the surplusage than to run the risk that the jury would become confused by the inconsistency between that which they were instructed to do and that which the question improperly suggested was permissible.

Plaintiff asserts that Question No. 1 is defective in yet another regard. By using the phrase, "was the loss created by, resulting from, contributed to or aggravated by any of the following: . . ." in Question No. 1, plaintiff contends that the trial court confused the jury as to the proper standard of causation. The correct standard, unchallenged by defendant, was contained in the trial court's instruction as to Question No. 2 of the special verdict; cause means the sole initiating force that puts all other forces into motion. *See: Sauer v. General Ins. Co.* (1964), 225 Cal. App. 2d 275, 37 Cal. Rptr. 303; *Kudella v. Newark Ins. Co.* (1958), 3 Wis. 2d 599, 601, 89 N. W. 2d 219. Thus, under the standard of Question No. 1, the jury could find for the defendant even if it believed a nonexcluded force contributed to the collapse.

The trial court's causation instruction, defendant would contend, served to mitigate the effect of the incorrect standard found in Question No. 1 because both Questions No. 1 and 2 had to be answered in the affirmative to find for the defendant. This is clearly not the case. Question No. 2, when properly read, is unnecessary to the verdict. It asks "[w]as such loss the cause of the damage sus-

tained by the plaintiff?" Substituting for the term "loss" as used in Question No. 1, Question No. 2 merely inquires as to the obvious; was the damage the cause of plaintiff's damage? The real question which links the force to the damage sustained is Question No. 1 which contains the improper standard of causation.

This court has held that a special verdict question which improperly states the standard of causation to be applied can be prejudicially confusing regardless of whether a properly framed instruction was given. In *Maahs v. Schultz* (1932), 207 Wis. 624, 242 N. W. 195, plaintiff brought an action for alienation of affections. Question No. 1 of the special verdict in that case asked if defendant was guilty of acts or conduct that was *a* controlling cause of the alienation. This court stated that the correct standard required that defendant be *the* controlling cause of the alienation. Despite an instruction by the trial court which stated the correct standard, this court remarked at page 634:

> "The effect of these two statements must have been confusing to the jury. When we reflect that the special verdict containing the expression 'a controlling cause' was taken with them to the jury room where they had it continually before them, it cannot be said, we think, that the instruction which they listened to but once was sufficient to erase from their minds the impression which must have been made by the language of the question."

Also the jury in this case, although instructed as to the proper standard, had the special verdict question continually before them. While it is true that the jury benefited from having the instructions read to them not once but again when they encountered difficulty in answering Question No. 5, it is also true that they did not adequately comprehend the instructions as evidenced by their incorrect response to that question. Further, even if the jury understood the causation instruction as given,

it was directed toward answering Question No. 2; the real causation question being contained in Question No. 1. We are of the opinion, Questions No. 1 and 2 were prejudicially confusing and misleading.

*New trial.*

In passing on the question of whether a new trial should be ordered, this court must determine whether the real controversy has been fully and fairly tried and be convinced that there has been no miscarriage of justice viewing the case as a whole. Sec. 251.09, Stats.; *Anderson v. Seelow* (1937), 224 Wis. 230, 271 N. W. 844.

Because of the jury's disregard of the instructions of the court in respect to Question No. 5 of the special verdict, the improper instruction as to the definition of "earth movement" in light of the limitation placed on that term by the application of *ejusdem generis* rule, the probable confusion caused by including in Question No. 1 of the special verdict several forces which the jury had been instructed to disregard because there had been no evidence to establish them as an issue, and the probable confusion caused by the incorrect standard of causation included in Question No. 1 of the special verdict, we are of the opinion that the real issue has not been fully and fairly tried and that it is probable that justice has been miscarried.

Because we have decided to grant a new trial in the interest of justice, we feel it unnecessary to undertake a discussion of the sufficiency of the evidence as plaintiff requests us to do. The judgment is reversed and a new trial granted; however, because damages and the design defect exclusion are not issues in this appeal, the new trial is limited to the issue of the applicability of the policy exclusion in question.

*By the Court.*—Judgment reversed and cause remanded for a new trial consistent with this opinion.